**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**ANTHONY QUINN GIBSON** **PLAINTIFF**

**VS.** **CAUSE NO. 3:23-cv-298-DPJ-ASH**

**VITALCORE HEALTH STRATEGIES, LLC** **DEFENDANT**

---

# DEFENDANT VITALCORE HEALTH STRATEGIES, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

This action stems from Plaintiff Anthony Gibson's claim that following a March 2021 complaint of inappropriate workplace sexual harassment, VitalCore Health Strategies, LLC ("VitalCore") retaliated against him. Mr. Gibson alleges that he complained about unfair treatment in December 2021, and two weeks later, he was abruptly terminated by VitalCore when the qualifications for his position of Health Services Administrator ("HSA") were changed to require licensure as a registered nurse.

VitalCore denies that Mr. Gibson was discriminated or retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") or any other applicable anti-discrimination laws.

## I. FACTUAL BACKGROUND[1]

### A. VitalCore Health Strategies.

VitalCore provides on-site healthcare as a vendor to correctional facilities across the nation. In essence, VitalCore staffs and operates medical practices serving inmates within the confines of correctional facilities. In October 2020, VitalCore successfully secured contracts to provide

---

[1] With the exception of the core issues of whether the touching complained of by the Plaintiff actually occurred and whether Plaintiff was terminated for reporting the alleged touching or for alleged failure to falsify documents, which the Defendant disputes, the facts recited in this section are not genuinely in dispute.

services at several Mississippi Department of Corrections ("MDOC") facilities in place of another provider, Centurion Managed Care ("Centurion"). VitalCore continues to provide services to the two facilities relevant in this matter, Central Mississippi Correctional Facility ("CMCF") and East Mississippi Correctional Facility ("EMCF").

VitalCore is an equal employment opportunity employer and keeps and maintains policies against harassment, discrimination and retaliation, including methods of reporting any such harassment or discrimination and ensuring no retaliation results from complaints. These policies are communicated to employees through the Employee Handbook. *See* Exhibit 1, *VitalCore Employee Handbook*, pp. 5, 33-34.

At least one year before VitalCore contractually began providing health services to MDOC facilities, the United States Department of Justice ("DOJ") began an investigation of MDOC facilities under the Civil Rights of Institutionalized Persons Act (CRIPA). The investigation focused on several deficiencies of the facilities, including inmate safety, security, medical and mental health services, suicide prevention, staffing, and healthcare leadership.

**B. Mr. Gibson's Employment with VitalCore.**

Mr. Gibson began working under Centurion assigned to the CMCF facility in 2018 as Assistant Health Services Administrator. His last position was as the Health Service Administrator ("HSA") at EMCF. As HSA, Gibson was the chief administrative manager of the on-site health services department. In this role, he was responsible for administrative duties at the facility, including supervising health services staff at EMCF. The HSA is accountable for the delivery of contract services and ensuring that VitalCore is in compliance with all aspects of the client contract. The HSA is responsible for recruiting and hiring all personnel and for interviewing and selecting contractual staff.

As a company, VitalCore has consistently recruited and hired registered nurses or nurse practitioners for the HSA position, as it is industry practice that only a nurse or a provider can supervise clinical nurses. Upon VitalCore's transition to contractually provide health services for the MDOC facilities, for ease of transition and limited disruption of services to patients and impact to staffing, VitalCore chose to allow all prior Centurion employees to remain in their respective positions during VitalCore's transition. Although VitalCore as a company preferred for HSAs to be registered nurses, an exception was made during its assumption of health services at the MDOC facilities, in order to maintain the continuity of care. At that time, there were only two HSAs who transitioned from Centurion to VitalCore who did not have a professional nursing background, Anthony Gibson being one of them.

The beginning of Mr. Gibson's employment was unremarkable. He performed well and his co-workers and superiors at the EMCF site had no complaints about him. He successfully led the site through a six-month long American Correctional Association ("ACA") audit and achieved certification at the conclusion of the process. Eventually, VitalCore needed Mr. Gibson's skills to temporarily assist with an ACA audit at CMCF after the HSA at that site resigned. Mr. Gibson was excited to take on this new challenge. He was to hire and train a team of staff who would then complete the audit process.

**C. Mr. Gibson's Harassment and Retaliation Allegations.**

While Mr. Gibson was working at CMCF, after work hours on Friday, March 26, 2021, he reported to Chief Executive Officer, Viola Riggin ("Ms. Riggin"), and Chief Medical Officer, Dr. Raman Singh ("Dr. Singh"), stating that he had an unpleasant experience that day, reporting that then-Vice President of Operations, Paul Millette ("Mr. Millette") "slapped him on the butt" in the presence of Gwendolyn Bush ("Ms. Bush").

After receiving the details about Mr. Gibson's complaint, VitalCore took Mr. Gibson's allegations seriously and initiated an investigation. During the investigation, Mr. Millette categorically denied Mr. Gibson's allegation. *See* Exhibit 2, *Deposition of Paul Millette*, 12:12-18. Ms. Bush, Mr. Gibson's purported witness, stated that she had been working in the office with Mr. Gibson and Ms. Hogue for an extended period of time when Ms. Hogue left the room. She was sitting on the ground, within an arm's reach of Mr. Millette, when Mr. Gibson walked past him, which is the precise time Mr. Gibson claimed the slap occurred. Ms. Bush reported that she did not hear or see anything that would indicate that Mr. Gibson had been touched by Mr. Millette. Ms. Gibson stated there was no slapping sound, no reaction by Mr. Gibson, and no mention of anything by Mr. Gibson after Mr. Millette left the office. In concluding its investigation, VitalCore determined that there was no violation of its policies. All involved employees resumed their work together without any issues. Mr. Gibson made no further reports or complaints of any kind concerning Mr. Millette. Mr. Gibson returned to his duties at EMCF, and he did not complete the ACA audit due to his difficulties with completing the files.

After the investigation, Mr. Gibson's performance at EMCF over the next several months met VitalCore's expectations. However, around Thanksgiving of 2021, three inmate suicides occurred at EMCF within 48 hours. During this time, Mr. Gibson failed to properly follow reporting protocol, to the detriment of the handling of the emergencies. Ms. Riggin and Dr. Singh reiterated to him the reporting procedure, which mandates that the facility HSA inform all regional administration, which includes Ms. Hogue and Dr. Singh. The next month, on December 20, 2021, there was a fourth inmate suicide. Again, there was a failure by Mr. Gibson to report the death immediately to Dr. Singh.

Instead, Dr. Singh learned of the suicide from MDOC Commissioner Burl Cain; Cain had

called Dr. Singh to discuss the suicide, but Dr. Singh had no knowledge of it, making VitalCore and Dr. Singh look careless. Mr. Gibson's proffered excuse for not informing Dr. Singh about the suicide was that the site medical director was supposed to notify Dr. Singh; however, under the established reporting protocol, this duty was Mr. Gibson's.

On December 21, 2021, Mr. Gibson sent a text message to complain of unfair treatment. Ms. Riggin reiterated to Mr. Gibson that notification is urgent and there is no explanation to justify the breakdown in communication, especially since this was not the first time there was a problem of this nature.

**D. Mr. Gibson's Separation of Employment.**

Given the close scrutiny of the DOJ's investigation related to issues concerning nursing staff and healthcare leadership, to ensure more nurses were employed at each site, and that leaders in the facilities were experienced mid-level to advanced level nurses, VitalCore made necessary changes in accordance with its companywide standards and practices for all HSAs to have a clinical nursing background.

As stated *supra*, Mr. Gibson is one of two individuals who were non-nurses serving in the Health Service Administrator position; the other individuals was employed at Parchman. The second employee was Willie Knighten, also a longtime employee at the Parchman facility, who also has brought an employment claim against VitalCore for different cause of action. (*Willie Knighten v. VitalCore Health Strategies, Dr. Raman Singh, Kathy Hogue, Viola Riggin*; In the Circuit Court of Sunflower County; Cause No. 2023-18). In January 2022, both individuals were released from their positions consistent with the changes to companywide standards and practices requiring nursing backgrounds for HSAs.

## II. ARGUMENT AND AUTHORITIES

### A. Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). Once the moving party shows that there is no genuine dispute as to any material fact, the nonmoving party "must come forward with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." *Little*, 37 F.3d at 1075. "When the movant has made a properly supported motion for summary judgment by demonstrating an absence of evidence to support the non-movant's case," the non-movants must "go beyond the pleadings and by … affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994) (quoting Fed. R. Civ. P. 56(e) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). A plaintiff's conclusory allegations and without more and unsupported assertions are insufficient to avoid summary judgment. *See Sanches v. Carrollton Farmers Branch Indep. Sch.*

*Dist.*, 647 F.3d 156, 165 (5th Cir. 2011).

**B. Mr. Gibson cannot establish a prima facie case of retaliation as it relates to his claim of sexual harassment.**

Mr. Gibson avers that VitalCore retaliated against him as a result of his sexual harassment claim; however, Mr. Gibson cannot establish a prima facie case of retaliation because he cannot establish the third element of his retaliation claim. To establish a prima facie case of retaliation, a claimant must show: (1) that he engaged in an activity protected by Title VII; (2) that his employer took an adverse employment action against him; and (3) that a causal link existed between the protected activity and the adverse action. *Fisher v. Lufkin Indus*., 847 F.3d 752, 757 (5th Cir. 2017; *Zamora v. City of Hous*., 798 F.3d 326, 331 (5th Cir. 2015).

Mr. Gibson arguably engaged in protective activity when he complained in March 2021 that his butt was slapped by Mr. Millette. However, Mr. Gibson must be able to show a causal link between the protected activity and the adverse action of his January 2022 separation from the company. There simply is no evidence to support that such a causal link can be made. Instead, several reasons support absence of a no causal link.

**1. Mr. Gibson's purported witness to the alleged sexual harassment actually refutes his claims.**

During VitalCore's investigation of Mr. Gibson's complaint, Ms. Gwendolyn Bush did not substantiate Mr. Gibson's allegations. Ms. Bush stated that she was sitting on the ground, within an arm's reach of Mr. Millette, when Mr. Gibson walked past him. While Mr. Gibson claims that the touching occurred at this time, Ms. Bush reported that she did not hear or see anything that would indicate that Mr. Gibson had been touched by Mr. Millette. There was no slapping sound, no reaction by Mr. Gibson, and no mention of anything by Mr. Gibson after Mr. Millette left the

office. *See* Exhibit 3, audio call of Gwendolyn Bush.[2]

**2. Time is not a favorable factor and does not support a causal connection between the protected activity and Mr. Gibson's separation.**

With respect to Mr. Gibson's eventual termination, a significant amount of time passed between both his reporting of alleged sexual harassment and his alleged instance of refusing to falsify documents, all of which occurred March 2021. VitalCore's decision to replace all non-nurse HSAs did not occur until at least eight months later in January 2022, well after Gibson engaged in the alleged protected activity. During that period of time, Mr. Gibson alleges that he was excluded from meetings, but he cannot demonstrate that he suffered any adverse activity such as demotion, pay decrease, loss of privileges, etc. In his complaint, Mr. Gibson further alleges that in December 2021, after a suicide had occurred at the facility, that Dr. Singh accused Mr. Gibson of not informing him, and VitalCore used this failure to report the suicide as "pretextual poor job performance so as to justify firing him." *Dkt. No. 1*, Complaint at ¶15. When questioned during his deposition about whether he believed that the failure to report the suicides to his superior was connected to the change of the HSA position requirements, he did not agree to there being any connection. *See* Exhibit 4, *Deposition of Anthony Gibson*, at 133:16 – 134:2. Additionally, when asked whether he had any counseling about the suicide issues, Mr. Gibson denied ever being counseled. However, based on text exchanges between CEO Viola Riggin and Mr. Gibson, it is evident that Mr. Gibson's failure to report a suicide to all superiors had occurred previously. *See* Exhibit 5, *Text messages between Anthony Gibson and Viola Riggin*.

Even despite some performance issues related to Mr. Gibson's failure to follow notification protocol in these emergency situations, no adverse employment action was ultimately taken against him regarding these failures. In fact, VitalCore could have used Mr. Gibson's failures as grounds

[2] Defendant will be submitting the actual recording via conventional filing.

for termination; instead, VitalCore maintained Mr. Gibson as employee. As stated by Chief Medical Officer, Dr. Raman Singh, outside of these issues, overall Mr. Gibson "did his job well." *See* Exhibit 6, *Deposition of Dr. Raman Singh*, at 78:21. At the time of his separation, VitalCore, although not required to, provided Mr. Gibson with a severance, electing to generously provide him with ninety days of paid administrative leave and setting his termination date as April 3, 2022 so that he could obtain replacement employment during that period. This same severance was also provided to the other discharged non-nurse HSA. *See* Exhibit 7, *Separation letters of Anthony Gibson and Willie Knighten.* These facts demonstrate that there was no causal connection between Mr. Gibson's termination and any of his performance issues, and that he was not terminated in retaliation for his March 2021 allegations.

**3. VitalCore's decision to require all HSAs to be qualified registered nurses constituted a non-discriminatory reason for VitalCore's decision to end Mr. Gibson's employment.**

Mr. Gibson cannot succeed on his claim of retaliation because there is no causal connection between his March 2021 protected activity and his January 2022 termination. Several key reasons refute his claims and support that VitalCore had a "legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

First, the decision to end Mr. Gibson's employment in January 2022 was based on the needs surrounding healthcare leadership and clinical experience, which necessitated that the HSA position be filled by mid to advanced level nurse. Mr. Gibson served in the position of Health Services Administrator ("HSA") where he was responsible for administrative duties at the facility including supervising health services staff. VitalCore has consistently recruited and hired Registered Nurses or Nurse Practitioners for this position, as it is industry practice that only a nurse or a provider can supervise clinical nurses. *See* Exhibit 8, *VitalCore's Responses to Plaintiff's Interrogatories* and

Exhibit 9, *VitalCore's job description for HSAs*. Upon VitalCore's transition to contractually provide health services for the Mississippi Department of Corrections ("MDOC") facilities, for ease of transition and limited disruption of services to patients and impact to staffing, VitalCore chose to allow all prior Centurion employees to remain in their respective positions during VitalCore's transition. VitalCore only had four weeks to prepare to take over the EMCF site where Mr. Gibson worked. Although VitalCore as a company preferred for HSAs to be registered nurses, an exception was made during the takeover of the MDOC facilities in order to maintain the continuity of care. Therefore, VitalCore retained Mr. Gibson in the role of HSA following the transition.

After taking over the contract, VitalCore learned of the extent of the Department of Justice ("DOJ") investigation into several MDOC facilities under the Civil Rights of Institutionalized Persons Act (CRIPA). The DOJ's investigation focused issues including such as inmate safety, security, medical and mental health services, and suicide prevention, the lack of sufficient nursing staff, and appropriate healthcare leadership. The DOJ noted in one of its reports, "[d]espite the change in provider [from Centurion to VitalCore], the health services leadership has remained the same, and there has not been a demonstrable improvement in mental health services." Given the DOJ's findings such as these, VitalCore made the proactive decision to ensure that more nurses were employed at each site, and that leaders in the facilities were experienced mid-level to advanced level nurses. This change was made not only in response to the DOJ's findings, but also in accordance with VitalCore's companywide standards and practices for all HSA leaders to have a clinical nursing background. *See* Exhibit 6, *Deposition of Raman Singh*, 57:5 – 60:10; Exhibit 2, *Deposition of Paul Millette*, 18:15 -19:1.

Second, Mr. Gibson was not the only employee impacted by the HSA requirement change.

*See* Exhibit 7, *Separation letters for Anthony Gibson and Willie Knighten.* Therefore, VitalCore's decision to require all HSAs to be qualified registered nurses, was a non-discriminatory reason. As discussed above, for ease of transition and limited disruption of services to patients and impact to staffing, VitalCore chose to allow all prior Centurion employees to remain in their respective positions during VitalCore's transition. This included two non-nurse HSAs, Mr. Gibson and Ms. Knighten, the HSA at the Parchman facility. Upon the HSA qualification requirement change, Mr. Gibson and Ms. Knighten were both released at the same time, and were provided the same severance terms. This further negates any inference that Mr. Gibson's termination was retaliatory. VitalCore's decision to require all HSAs be registered nurses, constituted legitimate, non-retaliatory business decisions.

**C. Mr. Gibson cannot make a prima facie case under the *McArn* exeption.**

Mr. Gibson also alleges retaliatory discharge under the *McArn* exception, a whistleblower exception to the employment at-will doctrine under Mississippi state law. In *McArn v. Bruce-Allied Terminix* (Miss. 1992), the Mississippi Supreme Court opined that an "at-will" employee would have a cause of action for wrongful discharge if he/she is terminated for (a) refusing to commit an illegal act, or (b) reporting an illegal act. To be successful in such a claim, a plaintiff must prove that: 1) he reported an illegal act; 2) the employer had knowledge of the report; and 3) the plaintiff would not have been terminated "but for" the report. Because Mr. Gibson cannot establish that he reported an illegal act, he has failed to satisfy the first element.

As relates to an alleged illegal act, Mississippi law requires that "the acts complained of [must] warrant the imposition of criminal penalties, as opposed to mere civil penalties." *Hammons v. Fleetwood Homes*, 907 So.2d 357, 360 (Miss. Ct. App. 2004). The illegal activity must be

criminal in nature or have a criminal penalty that could attach. *Frank v. City of Flowood*, 203 So. 3d 786 (Miss. Ct. App. 2016).

As mentioned above, the basis of Mr. Gibson's claim is that he was terminated because of his refusal to falsify documents related to the ACA audit process for the CMCF facility. This allegation is simply unfounded. Both VitalCore executives Kathy Hogue, Sr. Vice-President of Operations and Dr. Raman Singh, were involved during the ACA audit and both unequivocally deny requesting Mr. Gibson to falsify documents. *See* Exhibit 10, *Deposition of Kathy Hogue*, at 21:15-18; Exhibit 6, *Deposition of Raman Singh*, at 25:13-17. In fact, based on the deposition testimony of Ms. Hogue, there was a demonstrated lack of understanding by Gibson as to how to complete the tasks necessary for a facility undergoing the initial ACA audit process. *See* Exhibit 10, *Deposition of Kathy Hogue*, at 15:8-17. As explained by Ms. Hogue, Mr. Gibson's job was to retrieve information that was contained within separate records and prepare the information into the required format as required under the ACA guidelines. *See* Exhibit 10, *Deposition of Kathy Hogue*, at 14:21 – 16:11. As outlined in the ACA Manual, if a facility is in its initial stage of the pre-audit process, during this period of working toward compliance includes as follows.

> Preparation for an audit involves developing and implementing policies and procedures to ensure operations are consistent with expected practices, conducting staff training, making physical plant improvements, completing satisfactory inspections by independent safety and sanitation authorities, and preparing documentation and materials to demonstrate compliance.

*See* Exhibit 11, *ACA Manual of Accreditation Policy and Procedure*, p. 18.

In response to the allegation that someone asked him to falsify medical records, Ms. Hogue explained "with an electronic medical record system, there's not a way to falsify a medical record…just to give an example: If you asked me to create a medical record for somebody for something that happened two years ago for a patient, there's no way to do that." *See* Exhibit 10,

*Deposition of Kathy Hogue*, at 21:25 – 23:8. Ms. Hogue further explained that Gibson did not complete the files for the audit. She recalled an instance where Gibson asked her to get information from the medical record database to provide documentation, she described her response was "that is not my job. That is why you are here to provide those documents." *See* Exhibit 10, *Deposition of Kathy Hogue*, at 18:21-25.

Simply put, Mr. Gibson misunderstood the requirements of what was required during an initial audit process, which clearly led him to believe there was impropriety in completing the audit process. But "[a] plaintiff's subjective belief that the acts reported were illegal does not satisfy *McArn;* instead, the alleged act must actually be illegal." *McGrath v. Empire Inv. Holdings, LLC*, No. 1:11-CV-209-A-S, 2013 WL 85205, at *4 (N.D. Miss. Jan. 7, 2013) (citing *Wheeler v. BL Development Corp.*, 415 F.3d 399, 403 (5th Cir. 2005)).

The *McArn* exception also contains an inherent causation component. To prove his wrongful termination claim under Mississippi law, a plaintiff "must establish some causation between the reporting of the alleged misconduct and the decision process resulting in the discharge." *Dismuke v. City of Indianola*, 32 F. App'x 126, *4 (5th Cir. 2002); see *also Crawford v. Bannum Place of Tupelo*, 556 F. App'x 279, 285 (5th Cir. 2014)(noting the requirement for a causal nexus between the reporting of the alleged misconduct and the decision process resulting in the discharge.); *Hust v. Forrest Gen. Hosp.*, 762 So. 2d 298, 301-302 (Miss. 2000)(affirming summary judgment on a *McArn* claim where employee could not establish that alleged reporting of improper bidding procedures was related to termination).

Mr. Gibson's speculation that his alleged "refusal to falsify business records" was the cause of his termination is insufficient to avoid summary judgment. *See, e.g., Sanches v. Carrollton Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) ("Conclusional allegations

and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment."). Plaintiff has offered no evidence to support a reasonable belief that VitalCore was involved in any criminal or fraudulent activity. During his deposition, Mr. Gibson stated that he was asked to fill in sixteen folders for the audit and was told by Kathy Hogue, "Give me the folders. I'll do it." However, Gibson further testified that he never saw what Ms. Hogue allegedly did to satisfy that. When asked whether there were any other instances where Gibson perceived he was being asked to create documents that did not exist or to falsify documents, he acknowledged that there were not any other instances. *See* Exhibit 4, *Deposition of Anthony Gibson*, at 133:16 – 136:5.

In summary, other than his conclusory statements, Mr. Gibson cannot support his claims that he was requested to falsify business records or that VitalCore was involved in any illegal activity; accordingly, his *McArn* claim fails as well.

## III. CONCLUSION

For the foregoing reasons, Defendant VitalCore Health Strategies respectfully requests that the Court grant its Motion for Summary Judgment, finding that there is no genuine dispute as to any material fact and that Defendant is entitled to a judgment in its favor as a matter of law.

Respectfully submitted,

**VITALCORE HEALTH STRATEGIES, LLC**

By: /s/*Hiawatha Northington II*
Hiawatha Northington II, Mississippi Bar No. 10831
Jessica McLaurin, Mississippi Bar No. 104814
GORDON REES SCULLY MANSUKHANI, LLP
1000 Highland Colony Parkway, Suite 5203
Ridgeland, MS 39157
Telephone: (601) 427-6239
Facsimile: (662) 580-4556
hnorthington@grsm.com
jmclaurin@grsm.com

*Counsel for VitalCore Health Strategies, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 4th day of June 2024, served a copy of the foregoing upon all parties to this matter by electronically filing the same with the CM/ECF electronic filing system, which will cause a copy to be electronically served on all counsel of record.

*/s/Hiawatha Northington II*
HIAWATHA NORTHINGTON II
*Counsel for VitalCore Health Strategies, LLC*